UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CR-0252-X (4) |
| | § | |
| MARCO ANTONIO ALARCON | § | |
| MORENO, | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

Defendant Marco Antonio Alarcon Moreno has two motions to suppress pending before the Court. (Docs. 186 & 187). Moreno seeks to suppress all evidence obtained before and after the issuance of a search warrant as well as Moreno's *Mirandized* statements. The Court also held an evidentiary hearing on Moreno's motions. Having reviewed the parties' arguments, the applicable caselaw, and the underlying facts, the Court concludes that the search was constitutional, and therefore, the Court **DENIES** Moreno's motions to suppress. (Docs. 186 & 187).

### I. Background

Moreno seeks to suppress all evidence found pursuant to a search of 1015 Fernwood Avenue in Dallas (the "Fernwood Residence") and any statements he made after officers arrived at the residence.[1] The Court held an evidentiary hearing and finds that agents Hight, Castanon, and Smith all testified credibly.[2] In 2021,

---

[1] Doc. 186; Doc. 187.

[2] Doc. 198.

Moreno's codefendant met up with a target of a drug trafficking investigation, delivered cardboard boxes to the target, and then departed in a 2015 Nissan Altima (the "Altima").[3]  Officers then stopped the target and recovered a large amount of methamphetamine from inside the cardboard boxes—approximately $220,000 worth of methamphetamine—while other agents followed the Altima to the Fernwood Residence.[4]   Agents believed the Fernwood Residence was the source of methamphetamine and maintained surveillance on the residence for a week.[5]  They observed vehicles, including the Altima, regularly and exclusively parked in the back of the residence and that the front windows of the residence were always blacked out.[6]  The agents also observed many other security measures at the Fernwood Residence including: (1) surveillance cameras on the house, (2) burglar bars on the windows and other obstructions that blocked all view into the windows entirely, (3) a gate placed across the front driveway near the end of the driveway, (4) a cage around the whole front porch, and (5) a burglar-type preventative door on the back door.[7] Additionally, the backyard was sloped at a very significant angle, which made the Fernwood Residence significantly elevated compared to the depressed backyard, which sits lower than street level.[8]

---

[3] Doc. 187-1 at 6–8; Doc. 193 at 2–3.

[4] *Id.*; Doc. 207 at 16.

[5] Doc. 187-1 at 8; Doc. 193 at 3.

[6] *Id.*

[7] Doc. 207 at 22–23.

[8] *Id.* at 23, 133.

One day, agents set up surveillance both in front of and behind the Fernwood Residence and observed codefendants, while wearing face coverings, entering and exiting the back of the residence repeatedly before departing in the Altima.[9]  Agents subsequently stopped the Altima and found partially filled metal propane tanks inside, which agents knew to be commonly used in methamphetamine conversion laboratories.[10]  They also saw one codefendant in the Altima with a cell phone, and the investigation later revealed that the codefendant called Moreno and informed him that law enforcement had stopped them.[11]

Within a few minutes of that stop, a surveillance agent saw a vehicle arrive at the Fernwood Residence and park in the backyard.[12]  Moreno and a codefendant exited the vehicle and went into the residence.[13]  They then quickly exited the residence, now wearing masks, and the agent believed they were carrying heavy items out of the Fernwood Residence—although the agent couldn't see below their midsections, he noticed Moreno's and the codefendant's arms were stretched out downward while walking down the steps, not casually, but rather as if their arms were weighed down by holding heavy objects.[14]  For around thirty minutes, the agent continually observed Moreno entering and exiting the residence in this manner.[15]

---

[9] Doc. 187-1 at 8–9; Doc. 193 at 4–5.

[10] *Id.*

[11] Doc. 193 at 4–5.

[12] *Id.* at 5; Doc. 187-1 at 9.

[13] *Id.*

[14] Doc. 187-1 at 9–10; Doc. 193 at 5–6; Doc. 207 at 102.

[15] Doc. 187-1 at 9–10; Doc. 193 at 5–6.

Then, the agent saw Moreno exit the Fernwood Residence carrying, high up on his chest so that the agent could clearly see it, a gray plastic tub.[16]  The agent knew that these tubs are used in methamphetamine laboratories all the time.[17]  At that moment, the agent alerted the other agents to what he saw,[18] and suspecting that Moreno was destroying or preparing to depart with evidence, the agents then approached the Fernwood Residence and gave orders to Moreno and the codefendant.[19]  Moreno dropped the gray tub, jumped the fence, and fled on foot.[20] Agents captured him a few houses down from the Fernwood Residence while he was attempting to climb a fence.[21]  The codefendant remained inside the vehicle parked in the backyard of the Fernwood Residence.[22]

While in the backyard, agents observed multiple large, plastic jugs in plain view in the vehicle, which they believed contained, and in fact did contain, liquid methamphetamine.[23]  They also found crystallized methamphetamine inside the vehicle and noted that the plastic jugs smelled like methamphetamine.[24] All of these circumstances led the agents to believe the Fernwood Residence was likely a highly-protected methamphetamine conversion laboratory, and they decided to conduct a

---

[16] Doc. 207 at 105.

[17] *Id.*

[18] *Id.*

[19] Doc. 187-1 at 10; Doc. 193 at 6.

[20] *Id.*

[21] Doc. 193 at 6.

[22] *Id.*

[23] Doc. 187-1 at 10; Doc. 193 at 6–7.

[24] *Id.*

protective sweep of the residence to protect against potential harm to themselves or the destruction of evidence.[25]   But before they even entered the residence, the already-opened backdoor revealed a methamphetamine conversion laboratory in plain view inside the Fernwood Residence and a strong odor consistent with that kind of laboratory.[26]   The agents conducted a brief protective sweep of the residence and exited within minutes.[27]   Agents detained Moreno and gave him Miranda warnings.[28]

Later that day, a Magistrate Judge issued a warrant authorizing the search of the Fernwood Residence and vehicles located on the property.[29]   Agents provided an affidavit from DEA Officer Hight in support of the search warrant.[30]   The affidavit detailed all the events leading up to and connecting the Fernwood Residence to the distribution conspiracy.[31]   While executing this search warrant, agents found an active methamphetamine conversion laboratory with kilogram quantities of methamphetamine, multiple propane cooktops used to heat liquid methamphetamine, drying racks for methamphetamine, cans of acetone, and other methamphetamine paraphernalia.[32]   Agents also recovered clothing and an overnight bag inside the gray tub Moreno was carrying before he fled.[33]   Inside the bag were

---

[25] Doc. 187-1 at 10; Doc. 193 at 7.

[26] Doc. 193 at 7.

[27] Doc. 187-1 at 10; Doc. 193 at 7–8.

[28] *See* Doc. 186 at 5.

[29] Doc. 193 at 8; Doc. 193-1.

[30] Doc. 187-1.

[31] *Id.*

[32] Doc. 193 at 8.

[33] *Id.* at 9.

multiple cell phones, Moreno's immigration paperwork, and receipts documenting purchases of some of the items found inside the residence.[34]  Agents believed Moreno intended to flee with critical evidence.[35]

## II. Legal Standard

The Fourth Amendment to the Constitution ensures "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[36]  Generally, warrantless searches and seizures are considered unreasonable, subject to "specifically established and well-delineated exceptions,"[37] and the government bears the burden of establishing that the search falls into one of the exceptions.[38]  One of those exceptions exists when exigent circumstances justify immediate action by law enforcement.[39]  If, "given the totality of circumstances," an officer has an objectively reasonable basis for their concern for public safety, the exigent circumstances exception to the warrant requirement can apply.[40] Circumstances such as a "genuine risk that officers [] will be endangered, [] suspects

---

[34] *Id.*

[35] *Id.*

[36] U.S. CONST. amend. IV.

[37] *Katz v. United States*, 389 U.S. 347, 357 (1967).

[38] *United States v. Aguirre*, 664 F.3d 606, 610 (5th Cir. 2011).

[39] *Linicomn v. Hill*, 902 F.3d 529, 536 (5th Cir. 2018).

[40] *Id.*

will escape, or that evidence will be destroyed" can provide a reasonable basis for a warrantless search.[41]

If officers have obtained a warrant, the court must assess whether the magistrate judge had a substantial basis to conclude that probable cause existed for the search.[42]  Probable cause exists when "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."[43]  A search executed pursuant to a warrant supported by probable cause is reasonable.[44]  If there was no probable cause to issue a warrant, evidence recovered pursuant to that search should still not be excluded if the officers reasonably relied in good faith on the warrant.[45]  Generally, officers can rely in good faith on a warrant unless "it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."[46]

Under the exclusionary rule, evidence derived from an unconstitutional search should be suppressed,[47] but suppression is an "extreme sanction"[48] and only used as a "last resort."[49]

---

[41] *United States v. Menchaca-Castruita*, 587 F.3d 283, 289–90 (5th Cir. 2009).

[42] *Aguirre*, 664 F.3d at 613.

[43] *Id.*

[44] *United Transp. Workers v. Foster*, 205 F.3d 851, 858 n.12 (5th Cir. 2000).

[45] *United States v. Leon*, 468 U.S. 897, 922–23 (1984).

[46] *United States v. Allen*, 625 F.3d 830, 836 (5th Cir. 2010).

[47] *United States v. Calandra*, 414 U.S. 338, 347 (1974).

[48] *Leon*, 468 U.S. at 916.

[49] *Herring v. United States*, 555 U.S. 135, 140 (2009).

### III. Analysis

Proceeding in two arguments, the motions seek exclusion of any and all evidence found at the Fernwood Residence and any and all of Moreno's statements made after officers entered the property.[50]   First, Moreno argues that the agents' initial protective sweep of the residence was unconstitutional because they did not have a warrant.[51]   Second, Moreno contends that even after agents obtained a warrant, the search was unconstitutional because there was no probable cause to issue the warrant in the first instance.[52]   Because there were exigent circumstances requiring the agents' initial protective sweep and the warrant was supported by probable cause, the evidence recovered from the Fernwood Residence and Moreno's statements should not be suppressed.

### A. Exigent Circumstances

Moreno argues that the protective sweep of the Fernwood Residence was unconstitutional because the agents did so without a warrant.   The government concedes that the agents did not have a warrant when they initially conducted a protective sweep of the house.[53]   However, the government contends that ensuring their own safety and preventing the destruction of evidence were exigent circumstances justifying the warrantless protective sweep.[54]

---

[50] Docs. 186, 187.

[51] *See* Doc. 186.

[52] *See* Doc. 187.

[53] *See* Doc. 193.

[54] Doc. 193 at 15–19.

The exigent circumstances exception to the warrant requirement applies when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable."[55]   Given the totality of the circumstances, the search must be objectively reasonable.[56]  To determine if exigent circumstances are present, the Fifth Circuit considers factors such as (1) the degree of urgency involved, (2) the reasonable belief that contraband is about to be removed, (3) the possibility of danger to the police officers, (4) information indicating the possessors of the contraband are aware that police are on their trail, and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.[57]

Here, the agents' protective sweep was objectively reasonable.  Importantly, the agents knew, based on their many years of experience, that methamphetamine is readily destructible and drug dealers are likely to destroy evidence and attempt to escape.[58]  And the circumstances here indicated that Moreno and his codefendant were attempting to destroy evidence at the Fernwood Residence and escape.  First, a drug-trafficking investigation led agents to discover the Fernwood Residence after they observed Moreno's codefendant provide about $220,000 worth of methamphetamine to a target of the investigation and subsequently return to the

---

[55] *Lange v. California*, 141 S. Ct. 2011, 2017 (2021).

[56] *Linicomn*, 902 F.3d at 536.

[57] *Menchaca-Castruita*, 587 F.3d at 289–90.

[58] Doc. 207 at 30, 33, 36–37, 85–86, 97–98, 103–110, 123, 134–36, 142.

Fernwood Residence.[59]  Then, while surveilling the Fernwood Residence for a week, agents observed suspicious activity, including that the residence was heavily protected with substantial security measures like completely obstructed windows, surveillance cameras, and caged off porches and doors.[60]  They also noticed that vehicles were exclusively parked in the backyard, that individuals would put on masks only *after* entering the Fernwood Residence, and that certain individuals were routinely seen entering and exiting the residence.[61]  Then, on the day of the protective sweep, agents stopped Moreno's codefendants after they left the Fernwood Residence and recovered partially filled propane tanks, which the agents knew were used in methamphetamine conversion.[62]  The agents also believed they observed the codefendants quickly use a cell phone upon being stopped, and it was later confirmed that they did call Moreno at that time.[63]  Within minutes of that stop, another surveillance agent observed Moreno and a codefendant arrive at and quickly begin entering and exiting the Fernwood Residence.[64]  After about thirty minutes of observing what the agent believed to be, and in fact was, Moreno repeatedly carrying heavy items out of the Fernwood Residence, he saw Moreno carry out a gray plastic tub, which the agent knew to be an item commonly used in methamphetamine

---

[59] Doc. 187-1 at 6–8; Doc. 193 at 2–3.

[60] Doc. 207 at 22–23.

[61] Doc. 187-1 at 8–9.

[62] *Id.*; Doc. 193 at 4–5.

[63] Doc. 187-1 at 9; Doc. 193 at 5.

[64] Doc. 193 at 4–5; Doc. 187-1 at 5.

laboratories.[65]  At that moment, agents believed Moreno was destroying evidence, and they approached the backyard of the residence.[66]  Moreno immediately fled, further indicating the agents needed to act urgently.[67]  They then observed gallons of liquid methamphetamine in plain view in the vehicle parked in the backyard, and they also saw large volumes of methamphetamine and a conversion laboratory inside the Fernwood Residence in plain view from the back door that Moreno and his codefendant left wide open.[68]

In addition to their concern that Moreno and the codefendant were destroying evidence, the agents also knew based on experience that these labs were highly-protected, valuable assets of drug trafficking organizations and believed they needed to ensure they were not in danger.[69]  And that concern was bolstered by the location of the Fernwood Residence in relation to the officers—anyone inside the residence would have a significant advantage from their elevated position over the agents approaching from the depressed backyard.[70]  And the security cameras in place outside the residence could easily alert the occupants to the agents' presence.[71]  These circumstances, in total, led agents to reasonably belief that they must conduct a limited protective sweep—a brief search lasting less than a few minutes—in light of

---

[65] Doc. 207 at 105–06.

[66] *Id.* at 105–07, 110.

[67] Doc. 187-1 at 10; Doc. 193 at 6.

[68] Doc. 187-1 at 10; Doc. 193 at 7.

[69] *Id.*; Doc 207 at 107–08.

[70] Doc. 207 at 23, 133.

[71] *Id.* at 133.

the risk of destruction of evidence and officer safety. Therefore, the protective sweep was constitutional under the exigent circumstances exception.

## B. Probable Cause

Moreno also contends that the search of the Fernwood Residence is unconstitutional because there was no probable cause to issue the warrant.[72] The government notes that the officers relied in good faith on the signed warrant, and the magistrate judge also had probable cause to issue it.[73] The government is correct.

In this case, the magistrate had probable cause to issue a warrant to search the Fernwood Residence. Officer Hight's affidavit described in detail the investigation of a drug trafficking organization that led officers to discover the Fernwood Residence.[74] It described how officers watched Moreno's codefendant meet with a target of the investigation, give the target cardboard boxes filled with methamphetamine, and then return to the Fernwood Residence.[75] Then, during a week-long surveillance, agents observed many indications that drug activity was afoot at the Fernwood Residence: significant security measures in place, vehicles exclusively parked in the back of the residence, no use of the front door, blacked out windows, individuals putting on masks after entering the residence, and certain individuals repeatedly entering and exiting the residence.[76] Officers also recovered

---

[72] Doc. 187.

[73] Doc. 193.

[74] *See* Doc. 187-1.

[75] *Id.* at 6–8.

[76] *Id.* at 8–9.

propane tanks, which they knew to be associated with methamphetamine conversion, from a traffic stop of codefendants upon leaving the residence.[77]  Not coincidentally, within minutes of that stop, Moreno arrived at the Fernwood Residence and began briskly and repeatedly removing large items from the residence.[78]  And when officers arrived, he fled.[79]

Officers then saw, in plain view, plastic jugs of liquid methamphetamine in the vehicle parked at the residence, and also found crystallized methamphetamine.[80] Pursuant to the constitutional protective sweep, agents observed a methamphetamine conversion laboratory inside the Fernwood Residence.[81]  These circumstances, as well as Officer Hight's background and familiarity with the means and methods used in drug activity, were presented in the affidavit to the magistrate judge.[82]  Based on all of the circumstances, it was abundantly clear that a search of the Fernwood Residence would yield contraband and evidence of drug activity. Therefore, the magistrate judge had probable cause to issue the warrant.

Because there was probable cause to issue the warrant, the officers were required to conduct the search.  The good faith exception is unnecessary to the facts of this case because the officers were entitled, and in fact, required, to rely on the

---

[77] *Id.*

[78] *Id.* at 5–9.

[79] *Id.* at 10.

[80] *Id.*

[81] *Id.*

[82] *See* Doc. 187-1.

magistrate judge's search warrant that was supported by probable cause.[83]   The search of the Fernwood Residence was constitutional under the Fourth Amendment and therefore the evidence obtained from the search should not be suppressed. Likewise, Moreno's statements, after officers gave him Miranda warnings, were legally obtained.  Moreno argues that his post-arrest statements were tainted because the protective sweep and search were unconstitutional.[84]   There was no unconstitutional arrest or search, as discussed above, and therefore, Moreno's statements should also not be suppressed.

## IV. Conclusion

The evidence recovered from the Fernwood Residence and Moreno's *Mirandized* statements should not be suppressed because exigent circumstances justified the agents' warrantless protective sweep, and the later-obtained warrant was supported by probable cause.  Therefore, the Court **DENIES** Moreno's motions to suppress.  (Docs. 186 & 187).

**IT IS SO ORDERED** this 9th day of November, 2023.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

---

[83]  The government also notes that the agents would have inevitably discovered the evidence at the Fernwood Residence.  It is unnecessary for the Court to address this point because the initial protective sweep and the search executed pursuant to the warrant were constitutional.

[84]  Doc. 186 at 5; Doc. 187 at 8.